UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO. 3:12-cv-1385-J-12-TEM

SPRAGUE OWINGS,

     Plaintiff,

v.

T-MOBILE USA, INC.,

     Defendant.

_____/

## PLAINTIFF'S RESPONSE TO T-MOBILE USA, INC.'S MOTION TO STAY AND COMPEL ARBITRATION

### Introduction

Defendant T-Mobile USA, Inc. urges this Court to deny Plaintiff Sprague Owings his right to a trial by jury and to compel him to arbitrate his claims under the Florida Consumer Collection Practices Act ("FCCPA") and the Telephone Consumer Protection Act ("TCPA"), based on a boilerplate arbitration provision in an agreement that he purportedly entered into when he activated service for his cellular telephones. T-Mobile's own representative assured Mr. Owings, however, that no contract would exist if he purchased and used his own cellular telephones—which he did with that express understanding.

This Court should not blindly enforce the arbitration provision referenced by T-Mobile simply because public policy generally favors arbitration. The unique circumstances of this case—and this particular "agreement"—merit an exception to that policy. And the stakes are high. The Federal Trade Commission has recently studied the use of arbitration in the debt collection context and determined that such arbitration is fundamentally unfair to consumers.

In determining whether it is appropriate to compel Mr. Owings to arbitrate his claims,

this Court must consider the following issues:

1. A court must compel arbitration only if a valid agreement to arbitrate exists. If the parties dispute the existence of a valid agreement to arbitrate, a court can compel arbitration only if there are no genuine issues of material fact regarding the parties' agreement. Here, T-Mobile's own representative advised Mr. Owings that no contract would exist if he purchased and used his own cellular telephones; Mr. Owings did just that. Given that there is a genuine issue of material fact regarding the parties' agreement, should this Court compel arbitration?

2. Under Florida law, an agreement is unenforceable if it is both procedurally and substantively unconscionable.

    a. An agreement is procedurally unconscionable if there is no "real and voluntary meeting of the minds" or if the manner in which it was made reveals that a party did not have a meaningful choice. Here, T-Mobile's representative expressly advised Mr. Owings that he did not have to enter into a contract if he purchased and used his own cellular telephones, such that Mr. Owings did not believe he entered into an agreement when he activated service. In addition, the Service Agreement presented to Mr. Owings required him to acknowledge that he "received and read" Terms & Conditions and a rate plan that were not available to him at the time of execution. Given Mr. Owings' lack of a meaningful choice and the significant disparity in bargaining power, should this Court compel arbitration?

    b. An agreement is substantively unconscionable if it is unreasonable or unfair. Here, the agreement limits available remedies in a matter that defeats the remedial purposes of the applicable statutes. It also lacks mutuality with respect to arbitration of collection-related issues. Given that the agreement contains unreasonable and unfair provisions, should this Court compel arbitration?

3. Even if a valid agreement exists, a court must compel arbitration only if the claims fall within the scope of that agreement. Mr. Owings' claims stem from abusive debt collection practices and improper telephone calls. Given that his claims are not logically related to his acquisition of telephone services and are thus outside the scope of the agreement, should this Court compel arbitration?

This Court should answer these questions against the backdrop of the Federal Trade Commission's recent report on debt collection arbitration, which condemned such arbitration as fundamentally unfair to consumers.

## Statement of Facts

On April 3, 2012, Mr. Owings went to a T-Mobile store in Jacksonville, Florida. *See* Exh. 1, Owings Affidavit (Mar. 21, 2013), ¶ 4. He asked a T-Mobile representative if he could have service without a contract if he purchased his own cellular telephones. *Id.* She responded affirmatively. *Id.* Acting on that representation, Mr. Owings purchased cellular telephones at a local Walmart, returned to the T-Mobile store, and activated service. *Id.* Mr. Owings did not intend to enter into a contract by activating service. *Id.*, ¶ 5. Mr. Owings understood that no contract existed because he had purchased his own cellular telephones. *Id.* When lodging earlier, informal complaints against T-Mobile, Mr. Owings consistently took the position that no contract existed because of the representations made by T-Mobile's representative. *Id.*, ¶¶ 6-10.

## Standard

In ruling on a motion to compel arbitration, this Court must apply a standard similar to the summary judgment standard set forth in Federal Rule of Civil Procedure 56(c). *Hancock v. American Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012); *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003). "Where, as here, the parties dispute the existence of an agreement to arbitrate, a court may grant a motion to compel arbitration if 'there are no genuine issues of material fact regarding the parties' agreement.'" *Hancock*, 701 F.3d at 1261. Courts "should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 & n.9 (3d Cir. 1980); *accord Tickanen v. Harris & Harris, Ltd.*, 461 F. Supp. 2d 863, 866 (E.D. Wis. 2006) ("The court must consider all of the non-moving party's evidence and construe all reasonable inferences in the light most favorable to the non-moving party.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986)).

**Argument**

As the party seeking to compel arbitration, T-Mobile must establish that the parties entered into a written arbitration agreement that is enforceable under ordinary state law contract principles and that the claims asserted fall within the scope of the agreement. *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008). T-Mobile has done neither. In the absence of an agreement to arbitrate, a court cannot compel the parties to resolve their dispute in an arbitral forum. *AT&T Tech., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 648 (1986); *accord Vassilkovska v. Woodfield Nissan, Inc.*, 358 Ill. App. 3d 20, 24-25, 830 N.E.2d 619, 623 (Ill. App. 1st Dist. 2005) ("An agreement to arbitrate is treated like any other contract…. [W]ithout a contract to arbitrate, there can be no forced arbitration.").

**I.     No valid agreement to arbitrate exists because T-Mobile's representative advised Mr. Owings that he could subscribe to its services without a contract if he purchased and used his own cellular telephones, which he did.**

T-Mobile argues that Mr. Owings is bound to pursue arbitration because he signed a Service Agreement (thereby accepting separate "Terms & Conditions"), used his cellular telephones, and did not opt out of arbitration during the appropriate time frame. T-Mobile's argument is supported by the declaration of a records custodian, working in "Legal Affairs: Small Claims, Arbitration, Records" located in Albuquerque, New Mexico. *See* Doc. 10, Declaration of Christopher Muzio (Feb. 22, 2013), ¶ 2. Mr. Muzio opines: "Mr. Owning [*sic*] signed the Service Agreement, activated the Lines of Service with T-Mobile, and indicated his acceptance of the Terms & Conditions. Accordingly, Mr. Owings is bound to the Agreement for the Lines of Service and the Account." *Id.*, ¶ 18.

Mr. Muzio does not base his opinion on what actually happened in this case; he was not

personally involved in signing up Mr. Owings for services.  Instead, he bases his opinion on his review of T-Mobile's business records and on what is *likely* to happen if T-Mobile's "policies and practices" are followed.  *Id.*, ¶ 1.  Because Mr. Owings' situation is far from typical, however, a mere reference to business records does not tell the entire story.  As established by his own affidavit, Mr. Owings specifically asked *not* to be bound by a contract and was advised by T-Mobile's own representative how to accomplish this clearly stated goal.  T-Mobile expressly advised Mr. Owings that he could subscribe without a contract if he used his own phones in order to procure his business as a customer, and Mr. Owings reasonably relied on that promise. T-Mobile is estopped from now arguing to the contrary in order to avoid litigation.  *See generally White Holding Co. v. Martin Marietta Materials, Inc.*, 423 F. App'x 943, at *4 (11th Cir. 2011); *W.R. Grace & Co. v. Geodata Servs, Inc.*, 547 So.2d 919, 924 (Fla. 1989).

II.   **No valid agreement to arbitrate exists because the purported "agreement" between T-Mobile and Mr. Owings is procedurally and substantively unconscionable.**

A.   **Under Florida law, a contract is unenforceable if it is both procedurally and substantively unconscionable.**

The contract defense of unconscionability is applicable to arbitration agreements if the party asserting the defense proves both procedural and substantive unconscionability.  *Spring Lake NC, LLC v. Beloff*, --- So.3d ----, 2013 WL 845486, at *2 (Fla. 2d DCA Mar. 8, 2013); *see also Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1134 (11th Cir. 2010) (Florida law requires a showing of both procedural and substantive unconscionability) (citing cases); *Tranchant v. Ritz Carlton Hotel Co., LLC*, No. 2:10–cv–233–FtM–29DNF, 2011 WL 1230734, at *5 (M.D. Fla. Mar. 31, 2011) ("To determine whether a contract is unconscionable under Florida law, a court must examine the contract itself and the facts surrounding its making for both procedural and substantive unconscionability.") (citing cases).

Most courts take a "balancing approach" to unconscionability: "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Romano ex rel. Romano v. Manor Care, Inc.*, 861 So.2d 59, 62 (Fla. 4th DCA 2003), *rev. denied*, 874 So.2d 1192 (Fla. 2004).

   1. **Procedural unconscionability concerns the manner in which an agreement was made.**

Procedural unconscionability addresses "the process of making the contract." *Clotfelter v. Cabot Inv. Properties, LLC*, No. 5:10-cv-235-OC-10GRJ, 2011 WL 1196698, at *9 (M.D. Fla. Mar. 29, 2011). It includes elements such as "the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness of and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *Id.*; *see also Pendergast*, 592 F.3d at 1135 (court must determine whether the complaining party had "a meaningful choice" by evaluating whether the party had a realistic opportunity to bargain regarding the contractual terms, whether the terms were merely presented on a "take-it-or-leave-it" basis, and whether the party had a reasonable opportunity to know and understand the terms); *Brea Sarasota, LLC v. Bickel*, 95 So.3d 1015, 1017 (Fla. 2d DCA 2012) (same).

For example, a contract can be procedurally unconscionable if important terms are "'hidden in a maze of fine print,' minimized by deceptive sales practices, or if the contract has a 'take it or leave it' approach with an absence of meaningful choice on the part of the consumer." *Tampa HCP, LLC v. Bachor*, 77 So.3d 323, 327 (Fla. 2d DCA 2011). Likewise, a contract can be procedurally unconscionable when the individualized circumstances surrounding the transaction reveal that there was no "real and voluntary meeting of the minds." *Holmes v.*

6

*Westport Shipyards, Inc.*, No. 03-60105-COV-HUCK, 03-60105-CIV-TURNOFF, 2004 WL 3007087, at *5 (S.D. Fla. June 15, 2004) (quoting *Golden v. Mobil Oil Corp.*, 882 F.2d 490, 493 (11th Cir. 1989)).

### 2.   Substantive unconscionability concerns the fairness of an agreement.

By contrast, substantive unconscionability "looks to the contract terms themselves," focusing on matters "such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Clotfelter*, 2011 WL 1196698, at *9.  "Substantive unconscionability exists when the terms of [a] contractual provision are unreasonable and unfair."  *Golden*, 882 F.2d at 493.

For example, a contract can be substantively unconscionable if it limits liability in a manner that "substantially diminishes or circumvents" the statutory remedies otherwise available to a party and is thus contrary to public policy.  *LTCSP-St. Petersburg, LLC v. Robinson*, 96 So.3d 986, 988 (Fla. 2d DCA 2012); *accord Woebse v. Health Care & Retirement Corp. of America*, 977 So.2d 630, 634-35 (Fla. 2d DCA 2008).  Likewise, a contract can be substantively unconscionable when it lacks mutuality of obligation with respect to the arbitration of disputes. *Sierra v. Isdell*, No. 6:09-cv-124-Orl-19KRS, 2009 WL 2179127, at *4 (M.D. Fla. July 21, 2009).

### B.   The Service Agreement is procedurally unconscionable because there was no "real and voluntary meeting of the minds."

As explained above, procedural unconscionability exists "when the individualized circumstances surrounding the transaction reveal that there was no 'real and voluntary meeting of the minds'" of the contracting parties.  *Golden*, 882 F.2d at 493; *Holmes*, 2004 WL 3007087, at *5.  Here, there was no "real and voluntary meeting of the minds" between Mr. Owings and T-Mobile because he did not intend to enter into a contract and because T-Mobile's representative

affirmed that he did not need to do so if he simply purchased his own cellular telephones. Accordingly, the purported agreement is procedurally unconscionable.

### C.     The Service Agreement is procedurally unconscionable because it requires the customer to agree that he has "received and read" materials that admittedly have not yet been provided.

T-Mobile assures this Court that the arbitration provision it seeks to enforce was "prominently disclosed" in the parties' agreement.  Doc. 9 at 3.  Although the Service Agreement does contain a cursory reference to arbitration,[1] the specifics of the arbitration requirement are actually contained in a separate "Terms & Conditions" document.   Noteworthy, T-Mobile acknowledges in the Service Agreement that the "Terms & Conditions" and Rate Plan documents which form part of the "agreement" are entirely separate and must be obtained by the consumer—one option being to call 611 from a T-Mobile phone *after* service is activated:

> My "Agreement" with T-Mobile includes: (a) this Service Agreement; (b) T-Mobile's "Terms and Conditions"; and (c) any terms specific to my Rate Plan or service.  I can obtain copies of T-Mobile's Terms and Conditions and my Rate Plan specific terms at T-Mobile retail stores, at www.T-Mobile.com …, or by calling Customer Care at (800) 937-8997 or 611 from my T-Mobile phone.  I have received and read my Agreement.

*See* Doc. 10-1 at 1.  Thus, T-Mobile admittedly presented Mr. Owings with a Service Agreement that required him to acknowledge that he had "received and read" documents that were neither provided to him contemporaneously nor immediately available—one of which contained the detailed arbitration provision.

---

[1]     The Service Agreement contains only three lines relating to arbitration, two of which relate to the applicable procedure in Puerto Rico.  *See* Doc. 10-1 ("Disputes.  T-Mobile requires ARBITRATION of disputes UNLESS I OPT-OUT WITHIN 30 DAYS OF ACTIVATION.  See T-Mobile's Terms & Conditions for details and for procedures available to Puerto Rico customers for appealing decisions to the Telecommunications Board of Puerto Rico.").  Although T-Mobile emphasizes certain words from this provision in its motion to compel, *see* Doc. 9 at 3, the copy filed with this Court does not adequately display which type is bold-faced.

Because it does not present the customer with the entire agreement or the detailed arbitration agreement, yet requires the customer to acknowledge that he has "received and read" those agreements, the Service Agreement is inherently unconscionable.  As one judge noted in *Mercedes Homes, Inc. v. Colon*, "[t]he entire structure of the transaction appears contrived and calculated to mislead."  966 So.2d 10, 21(Fla. 5th DCA 2007) (Griffin, J., dissenting) (trio of documents raise procedural and substantive unconscionability issues, where buyer was told in contract that he would be enrolled in an asset protection program for which documentation would be supplied later, and application and warranty booklet were not presented until after the contract was signed).

Other courts have found that merely failing to attach the applicable JAMS rules to an arbitration provision add to an agreement's oppressive nature and procedural unconscionability. *See Lara v. Onsite Health, Inc.*, --- F.Supp.2d ----, 2012 WL 4097712, at *6 (N.D. Cal. Sept. 17, 2012) (citing cases).  T-Mobile's omission is far more egregious:  it fails to provide the consumer with any details about the required arbitration whatsoever.  As such, it is procedurally unconscionable.[2]

### D.       The Service Agreement is procedurally unconscionable because of the disparity in bargaining power between T-Mobile and Mr. Owings.

The Service Agreement is also procedurally unconscionable because of the disparity in bargaining power between Mr. Owings and T-Mobile.  *See Abels v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1279 (S.D. Fla. 2009) (arbitration clause procedurally

---

[2]       And, as such, the cases cited in support of T-Mobile's argument that "Florida and federal circuit courts have enforced arbitration agreements accepted by a customer's continued use of a product or service" are inapposite. *See* Doc. 9 at 8-9.  In those cases, the consumers used a credit card or accepted services after an arbitration agreement was physically mailed to them.  T-Mobile, by contrast, requires its customers to seek out and procure their own copies of the agreements.

unconscionable because parties had no meaningful choice in accepting or rejecting the contract given the disparity in bargaining power). The fact that Mr. Owings had other choices in the market does not negate the procedural unconscionability present because of the adhesive nature of the agreement. *See Gatton v. T-Mobile USA, Inc.,* 152 Cal. App. 4th 571, 585 (2007) ("We reject the rule proposed by T–Mobile. Instead we hold that absent unusual circumstances, use of a contract of adhesion establishes a minimal degree of procedural unconscionability notwithstanding the availability of market alternatives…. [C]ourts are not obligated to enforce highly unfair provisions that undermine important public policies simply because there is some degree of consumer choice in the market.").

> **E.      The Terms & Conditions are substantively unconscionable because they limit available remedies and prohibit a customer from seeking statutory damages.**

Although parties may agree to arbitrate statutory rights, arbitration must offer an effective way to vindicate those rights. *Alterra Healthcare Corp. v. Bryant*, 937 So.2d 263, 266 (Fla. 4th DCA 2006). An agreement that contains "provisions which defeat the remedial portions of a statute is not enforceable" and is void as contrary to public policy *Id.* (refusing to enforce agreement that waived punitive damages and capped non-economic damages because it defeated the remedial purpose of a Florida statute) (citing cases); *see, e.g., Woebse*, 977 So.2d at 634-35 (agreement substantively unconscionable where it "specifically deprives" a party of statutory rights); *Prieto v. Healthcare & Ret. Corp. of Am.*, 919 So.2d 531, 533 (Fla. 3d DCA 2005) (agreement substantively unconscionable where it limits non-economic damages provided for by statute, bars punitive damages and attorneys' fees provided for by statute, and restricts access to discovery necessary to prove statutory violations); *Romano*, 861 So.2d at 61-63 (agreement unenforceable where it contains provisions "that defeat the remedial purposes of the statute").

Here, the Terms & Conditions that purportedly form part of the agreement between T-Mobile and Mr. Owings specifically limit liability to "direct and actual damages"—stating that neither party will seek "any indirect, special, consequential, treble, or punitive damages from the other."  Doc. 10-2 at 8, ¶ 24.  Because the agreement limits Mr. Owings' ability to seek available statutory damages under the FCCPA and treble damages under the TCPA, it is substantively unconscionable.[3]

      **F.**      **The Terms & Conditions are substantively unconscionable because of a lack of mutuality with respect to the arbitration of collection-related issues.**

T-Mobile argues that "the Arbitration Agreement is valid based on traditional contract principles of mutuality and consideration," reassuring this Court that "[m]utuality is evident … since any dispute or controversy by either side must be submitted to arbitration."  Doc. 9 at 12.  In fact, however, mutuality is conspicuously absent in the arbitration provision.  Whereas T-Mobile insists that Mr. Owings cannot pursue this debt collection related matter in litigation, it expressly reserves its own right to assign an account for collection, to be pursued by the collection agency in state court:

> You may pursue your claim in court only under the circumstances described below [namely, small claims court or if opt-out procedures are followed within thirty days of activation].  We each agree that if you fail to timely pay amounts due, we may assign your account for collection, and the collection agency may pursue in court claims limited strictly to the collection of the past due amounts and any interest or cost of collection permitted by law or the Agreement.

Doc. 10-2, at 1-2.  Lack of mutuality with respect to the arbitration of disputes is one factor that renders an agreement substantively unconscionable.  *See Sierra*, 2009 WL 2179127, at *4;

---

[3]     Some courts have overlooked similar defects where an agreement contained a severability clause, simply excising the offending provision.  *See, e.g.*, *Brueggemann v. NCOA Select, Inc.*, No. 08-80606-CIV, 2009 WL 1873651, at *4 (S.D. Fla. June 30, 2009).  No such clause rescues T-Mobile's Terms & Conditions.  *See* Doc. 10-2.

*EEOC v. Taco Bell of Am., Inc.*, No. 8:06-cv-1792-T30MAP, 2007 WL 809660, at *1 (M.D. Fla. Mar. 15, 2007); *Palm Beach Motor Cars Ltd., Inc. v. Jeffries*, 885 So.2d 990, 992 (Fla. 4th DCA 2004); *see also Kinko's, Inc. v. Payne*, 901 So.2d 354, 355 (Fla. 2d DCA 2005) (where only one party is required to submit to arbitration, an arbitration agreement lacks consideration); *see, e.g., Vassilkovska*, 358 Ill. App. 3d at 26, 830 N.E.2d 619, 624 (arbitration agreement not supported by consideration where dealership did not promise on its part to submit claims to arbitration).

**III.    Even if a valid agreement to arbitrate did exist—it does not—Mr. Owings' FCCPA and TCPA claims do not fall within the scope of that agreement.**

Mr. Owings' claims under the FCCPA and the TCPA do not relate to his acquisition of wireless telephone services or to any debt that he incurred in relation to those services; rather, they stem from T-Mobile's illegal debt collection practices and improper and unauthorized calls to his cellular telephone.  Mr. Owings does not rely upon the Service Agreement in asserting his claims, nor does he mention it in his complaint.  Applying well-established jurisprudence to this scenario, the claims at the heart of this lawsuit do not fall within the scope of the alleged agreement.

**A.    The scope of an arbitration agreement is a straightforward question of contract interpretation.**

Whether a given claim falls within the scope of an arbitration agreement is a matter of contract interpretation and a question of law for this Court.  *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1213 (11th Cir. 2011). "[F]ederal law comprising generally accepted principles of contract law controls the question of arbitrability."  *Morewitz v. W. of Eng. Ship Owners Mut. Prot. & Indem. Ass'n*, 62 F.3d 1356, 1364 (11th Cir. 1995).  Section 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, therefore "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms."  *Id.* (quoting *Volt*

*Info. Sciences, Inc. v. Bd. of Tr. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)). Notwithstanding T-Mobile's contentions, an arbitration clause is neither hallowed nor sacrosanct.[4]  On the contrary, the FAA itself declares written provisions for arbitration "valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*"  9 U.S.C. § 2 (emphasis added).

> **B.**     **A consumer's debt and a debt collector's abusive collection practices bear no logical relation to one another.**

Courts throughout the country have determined that a consumer's debt and a debt collector's abusive debt collection practices are simply not "logically related." *See, e.g., Whigum v. Heilig-Meyers Furniture, Inc.*, 682 So. 2d 643, 646 (Fla. 1st DCA 1996) ("[A]n action on a debt for the purchase of consumer goods is a permissive counterclaim to an action under the [FCCPA]" because "the actions do not 'arise' out of the same aggregate set of operative facts. The debtor's action under the statute is based on the commission of prohibited debt collection practices, and the creditor's action on the debt is based on the failure to pay for consumer goods sold on credit."); *Hortado v. Tam Fin. Corp.*, No. EP-07-CA-065-FM, 2007 WL 1746884, at *2 (W.D. Tex. June 5, 2007) (all courts to have considered the issue have concluded that creditor's claim for payment of debt is not logically related to debtor's Fair Debt Collection Practices Act ("FDCPA") claim based on improper debt collection practices).

---

[4]     In fact, the arbitration clause is up against an equally formidable and countervailing principle:  "The right of trial by jury as declared by the Constitution or by statute shall be preserved to the parties inviolate."  Fla. R. Civ. P. 1.430(a).  Although this right may be waived, "[w]aiver of the right to a jury trial is to be strictly construed and not to be lightly inferred." *Poller v. First Va. Mortg. & Real Estate Inv. Trust*, 471 So.2d 104, 106 (Fla. 3d DCA 1985). Moreover, "[q]uestions as to the right to a trial by jury should be resolved in favor of the party seeking the jury trial." *Amquip Crane Rental, LLC v. Vercon Constr. Mgmt., Inc.*, 60 So.3d 536, 539 (Fla. 4th DCA 2011).

FCCPA claims, which closely resemble FDCPA claims for abusive debt collection practices, are fundamentally different from the matters addressed in the Service Agreement and the Terms & Conditions:

> Although defendants' right to payment from plaintiff is certainly factually linked to the fairness of defendants' collection practices—there being no attempted collection without an alleged debt—a cause of action on the debt arises out of events different from the cause of action for abuse in collecting. The former centers on evidence regarding the existence of a contract, the failure to perform on a contract, or other circumstances leading to the creation of a valid debt. The latter centers on evidence regarding the improprieties and transgressions, as defined by the FDCPA, in the procedures used to collect the debt, regardless of the debt's validity.

*Ayres v. Nat'l Credit Mgmt. Corp.,* No. 90-5535, 1991 WL 66845, at *1 (E.D. Pa. Apr. 25, 1991); *see also Barcena v. Tam Fin. Corp.*, No. EP-07-CA-0020-KC, 2007 WL 1452587, at *3 (W.D. Tex. May 8, 2007) (claim to recover debt arises out of "aggregate core operative facts" distinct from those underlying FDCPA claim); *accord Strange v. Wexler*, 796 F. Supp. 1117, 1118 (N.D. Ill. 1992) (plaintiff's liability for a debt is immaterial to claim that debt collector violated FDCPA); *Kolker v. Duke City Collection Agency*, 750 F. Supp. 468, 471 (D.N.M. 1990) (consumer's liability for underlying debt is "irrelevant and immaterial" to whether debt collector is liable for conduct that violates FDCPA).

The logic behind these opinions applies equally here.  Mr. Owings' alleged debt pursuant to the Service Agreement and T-Mobile's collection tactics raise different factual and legal issues and are governed by different bodies of law.  *Gutshall v. Bailey & Assocs.,* No. 90-C-20182, 1991 WL 166963, at *2 (N.D. Ill. Feb. 11, 1991).  Because they present different factual and legal issues, FCCPA and TCPA violations do not fall within the scope of the arbitration provision that T-Mobile seeks to enforce.

IV.     **Arbitration is also inappropriate because the Federal Trade Commission has recently determined that debt collection arbitration is fundamentally unfair to consumers.**

In 2010, the Federal Trade Commission ("FTC") released a report in which it concluded that "consumers are not given meaningful choice whether to enter into arbitration and that the debt collection arbitration process is fundamentally unfair to them." Exh. 2, Federal Trade Commission, Repairing a Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration (July 2010)**,** *available online at* ftc.gov/os/2010/07/debtcollectionreport.pdf, at 2. In reaching this conclusion, the FTC articulated numerous concerns about arbitration in the debt collection context, including "(1) binding consumers to resolve disputes through arbitration without meaningful choice or awareness; (2) bias or the appearance of bias in arbitration proceedings; [and] (3) procedural unfairness in arbitration proceedings." *Id.* at ii. Unable to escape this reality, even T-Mobile cites a case emphasizing the "inherent weaknesses" of arbitration. Doc. 9 at 14 (quoting *Paladino v. Avnet Computer Techs, Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998)).

A.     **Consumers do not have a "meaningful choice" under the existing framework for debt collection arbitration.**

The FTC focused on the lack of meaningful choices for consumers, noting that "[c]onsumers currently have little, if any choice regarding mandatory pre-dispute arbitration provisions in contracts" and that "[c]reditors should draft their consumer credit contracts in a way that ensures consumers are aware of their choice whether to arbitrate, and provides consumers with a reasonable method of exercising that choice." *Id.* at iv. Consumers "can make meaningful choices" with respect to arbitration of debt collection claims "only if they are aware of the arbitration provisions in contracts and have the ability to make choices regarding those provisions"; thus, they must have "a basic understanding of arbitration and its consequences."

15

*Id.* at 42, 45.  The FTC vowed to closely monitor debt collection arbitration and evaluate whether creditors and arbitration forums such as the American Arbitration Association ("AAA")—the only forum that can arbitrate this dispute under T-Mobile's arbitration clause, *see* Doc. 10-2 at 2—provide consumers with meaningful choice and fair process.  Exh. 2 at v.

**B.      The existing framework for debt collection arbitration is plagued by bias.**

The FTC expressed grave concerns relating to bias, and the appearance of bias, noting the "repeat player" bias and the fact that arbitration forums have "an incentive to favor those who pay their salaries and expenses and decide whether to continue sending business to them."  *Id.* at 51.  Emphasizing the need for rigorous standards of ethical conduct for arbitration forums, the FTC stated:

> More generally, the Commission concludes that rigorous standards of ethical conduct for arbitration forums, arbitration administrators, and arbitrators are sorely needed…. If the private sector cannot or will not take the action needed, then either the government should develop and enforce such standards or Congress should prohibit debt collection arbitration entirely and have these matters resolved in the public court system.

*Id.* at 53.  The FTC also noted that "the vast majority of consumers" lose in arbitration—by some reports, up to 94 percent—which further underscores these bias concerns. *Id.* at 62.

**C.      The existing framework for debt collection arbitration does not provide adequate information to consumers or the public.**

Third, the FTC faulted the lack of "transparency" in debt collection arbitration.  *Id.* at 62-63.  For example, the FTC criticized the lack of information provided by arbitrators on the basis for the awards and how the award amounts are calculated.  *Id.* at v. "[R]easoned opinions are rare in arbitration."  *Id.* at 62.  It is important for arbitration results to be available to the public.  *Id.* at 67 ("If consumers are to choose whether to consent to arbitration of their disputes, including

whether to permit their disputes to be handled by a particular arbitration forum, then they must have sufficient information to make these choices meaningful.").

    **D.**    **This Court must give "due consideration and great weight" to the FTC's Report.**

This Court must give "due consideration and great weight" to "the interpretations of the Federal Trade Commission" relating to the FDCPA in evaluating Plaintiff's FCCPA claim.  Fla. Stat. § 559.77(5).  In light of this unambiguous mandate, this Court should decline to compel a process that has been found by the United States government to be corrupted by bias, unfairness, and lack of meaningful choice.

## Conclusion

As if to imply that it should prevail through sheer volume of cases cited, T-Mobile saturates its brief with examples of cases in which courts enforced arbitration provisions in all sorts of contexts:  credit card agreements, mobile home contracts, pest control contracts, construction contracts, automobile disputes, and even two FCCPA cases. *See, e.g.*, Doc. 9 at 11 nn. 5-9.  Notwithstanding, T-Mobile concedes, as it must, that this Court can only compel the parties to arbitrate "when the parties have agreed to do so." *Id.* at 11.  Mr. Owings has presented affirmative evidence that he did not agree to a contract with T-Mobile, let alone the arbitration provision buried in the Service Agreement or in the Terms & Conditions that he supposedly "received and read" with it—even though the Service Agreement expressly advises that the consumer must obtain those Terms & Conditions separately and suggests that the consumer might dial 611 T-Mobile from his mobile phone to do so *after* activation.  T-Mobile simply has not satisfied the applicable standard:  a genuine issue of material fact exists as to whether the

parties entered into an agreement.   This Court should allow Mr. Owings to proceed with this litigation in his chosen forum.

Respectfully submitted this 25th day of March, 2013.

By: /s/ Alex D. Weisberg
ALEX D. WEISBERG
FBN: 0566551
WEISBERG & MEYERS, LLC
ATTORNEYS FOR PLAINTIFF
5722 S. Flamingo Rd, Ste. 656
Cooper City, FL 33330
(954) 212-2184
(866) 577-0963 fax
aweisberg@attorneysforconsumers.com

## CERTIFICATE OF SERVICE

I certify that on March 25, 2013, a copy of the foregoing was served by CM/ECF on the

following filing users:

Fentrice D. Driskell
Sara G. Witmeyer
CARLTON FIELDS, P.A.
P.O. Box 3239
Tampa, FL 33601-3239
(813) 223-7000
fdriskell@carltonfields.com
switmeyer@carltonfields.com

James Baldinger
CARLTON FIELDS, P.A.
CityPlace Tower
525 Okeechobee Blvd., Suite 1200
West Palm Beach, FL 33401
(561) 650-8026
jbaldinger@carltonfields.com

Kristy McAlister Brown
ALSTON & BIRD, LLP
1201 W. Peachtree St.
Atlanta, GA 30309
(404) 881-7584
Kristy.brown@alston.com

*Attorneys for Defendant T-Mobile USA, Inc.*

/s/ Alex D. Weisberg
ALEX D. WEISBERG
FBN: 0566551
WEISBERG & MEYERS, LLC
ATTORNEYS FOR PLAINTIFF
5722 S. Flamingo Rd, Ste. 656
Cooper City, FL 33330
(954) 212-2184
(866) 577-0963 fax
aweisberg@attorneysforconsumers.com